## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

FL RECEIVABLE TRUST 2002-A,

                Plaintiff,

vs.

BAGGA ENTERPRISES, INC., JAMUNA
REAL ESTATE, LLC, UNITED
MANAGEMENT SERVICES, INC., and
WELCOME GROUP, INC.,

                Defendants.

Assigned Judge:
Hon. Lowell A. Reed, Jr., S.J.

Civil Action Nos. 02-CV-2710
                  02-CV-2711
                  02-CV-2080
                  02-CV-2086

## MEMORANDUM OF LAW OF PLAINTIFF FL RECEIVABLE TRUST 2002-A
## IN OPPOSITION TO MOTION TO QUASH SUBPOENA

Plaintiff FL Receivable Trust 2002-A (the "Trust"), through its attorneys, Obermayer

Rebman Maxwell & Hippel LLP, and Thacher Proffitt & Wood LLP, submits this memorandum

of law and the accompanying affidavit of Robert Hermann ("Hermann Affidavit") in opposition

to the motion of Khushvinder K. Bagga ("Bagga") for an order quashing a subpoena *duces tecum*

issued to Bagga by the Trust dated August 11, 2003. The subpoena seeks the following records

from 2000 to the present: tax returns for Bagga's business K & P Real Estate ("K & P"), Bagga's

personal tax returns and correspondence written, prepared and/or sent by Bagga. The subpoena

also seeks records for Bagga's home and/or personal computer for 2002 and 2003. Bagga has

agreed to produce tax returns for K & P, as well as the schedule to her personal tax return that

was filed for K & P in 2001. Therefore, this motion concerns only the portion of the subpoena

which seeks Bagga's personal tax returns, her computer records and her correspondence.

## PRELIMINARY STATEMENT

This Court has previously ruled that information about Bagga's personal assets was properly discoverable in deposition questioning of her. The information Bagga revealed during her deposition demonstrates there is no discernible line between Bagga's personal financial dealings and those of the corporate defendants. Bagga is a wealthy, sophisticated business woman who had discretion to issue checks from the defendant companies' various bank accounts, and she used her discretion by treating those accounts as if they were hers personally. She claims to have loaned money to the defendant companies and repaid herself, all without supporting documentation, supervision or accountability. She has no credible or consistent explanation for the fact that she has more than $400,000 in her personal checking account. She is equally vague concerning the finances of the businesses for which she was responsible for paying bills. She acknowledges she issued checks and wires on behalf of Bagga-owned American Merchandising Co., Inc. ("American Merchandising") payable to one company totaling approximately $8 million in just one year, but she can do no more than speculate as to why the money was paid. She contends that she is owed "a lot" of money from the defendants, but she has produced no records of those debts and claims not to remember how much they are.

Her own testimony establishes not only that Bagga was a significant participant in the financial operation of the defendant companies who consistently ignored the line between her business and her personal dealings, but that there is likely to be valuable information in the computer and personal records that Bagga kept only at home. This testimony amply justifies the Trust's effort to discover information about Bagga's personal finances in its quest to locate assets of the defendant companies. There is no other means of obtaining this critical information. Accordingly, Bagga's motion to quash the subpoena *duces tecum* should be denied.

## FACTS

For the convenience of the Court, what follows is a brief summary of the facts set forth in the Hermann Affidavit.

The four judgment debtor defendants defaulted on millions of dollars of loans that the Trust's predecessor in interest, Captec Financial Services, made to them in connection with a group of Arby's fast-food restaurants owned and operated by Pratpal (a/k/a "Paul") Bagga in Pennsylvania and Texas. The Trust seeks to execute on default judgments obtained against each of the defendants with respect to those loans. Hermann Affidavit ¶ 3.

Bagga is the wife of Paul Bagga. Together, they own and control dozens of companies, principally in Pennsylvania, in fast food, clothing and other businesses. They are related to, and involved in business ventures with, Paul Bagga's cousin Ravinder Chawla, a prominent real estate developer in Philadelphia who is also in the clothing business with the Baggas (and who is being sued in this Court for selling counterfeit goods, Nike v. Brandmania, 00 Civ. 05148). Hermann Affidavit ¶ 4.

On or about May 20, 2003, this Court granted, over Bagga's opposition, a motion by the Trust for an order compelling Bagga to appear for a deposition. Although the Court ordered the deposition to occur by June 4, 2003, Bagga left the country to travel to India and was not made available for deposition until June 17, 2003.[1] Hermann Affidavit ¶ 5. The deposition commenced on that date; however, Bagga's counsel blocked inquiry concerning Bagga's personal assets. After the parties submitted letter briefs on the propriety of that conduct, this Court issued on July 17, 2003 an order requiring that Bagga resume her deposition and answer

---

[1] Excerpts from Bagga's June 17, 2003 deposition are referenced herein as "June:" followed by the page number of the deposition testimony. The entire transcript of the June deposition is annexed to the Hermann Affidavit as Exhibit 2.

"all questions propounded at the deposition of June 17, 2003 as to which she was instructed not to answer on the grounds of 'personal assets or matters' or other grounds of relevancy and answer reasonable follow-up questions." Hermann Affidavit ¶ 6, Exhibit 1.

On August 7, 2003, the Trust resumed Bagga's deposition.[2]  Although Bagga's counsel criticizes the questioning at the resumed deposition, no effort was made to terminate the examination or to preclude any of the questioning. Hermann Affidavit ¶ 7.  During the course of the two days of deposition testimony, Bagga testified in pertinent part as follows:

She worked at Dunn & Bradstreet after graduating from college and her major in college was business management (June: 32, 33, 34).  She was formerly the sole owner of various clothing stores that she operated as a franchisee, and was the president of a company identified as KB Apparel that was set up to deal with her franchises (June: 36, 37, 39).  She handled the internal records for KB Apparel (August: 45, 46).

Bagga is the sole owner of the office building in which some of the Bagga family businesses are located (June: 25; August: 24).  She is also the sole owner of a real estate company, K & P, which owns real estate and leases it out to some of the Arby's stores (June: 15, 17, 18, 20, 109-111).  K & P receives the rent and pays the mortgage (June: 111).  Bagga gets any net income from K & P (August: 111, 112).  However, she claimed not to remember if she received any net income from K & P in the last three years (August: 112, 113).

Bagga owned 50% of defendant Jamuna Real Estate, LLC ("Jamuna") a few years ago, but transferred it in 2000 or 2001 to her husband (June: 92, 93, 94).  She claimed not to remember if she received an interest in any other entity in return for the transfer (June: 92, 93,

---

[2] Excerpts from Bagga's August 7, 2003 deposition are referenced herein as "August:" followed by the page number of the deposition testimony.  The entire draft transcript of the August deposition is annexed to the Hermann Affidavit as Exhibit 3.

94). However, after initially invoking her Fifth Amendment right against self-incrimination, Bagga subsequently testified that both Jamuna and K & P were originally co-owned by both her and Paul Bagga, and he then transferred K & P to her entirely and she transferred Jamuna to him entirely (August: 27, 129).

At her June 2003 deposition, Bagga testified she was employed by defendant Bagga Enterprises, Inc. ("Bagga Enterprises") where she oversees its billings and payables (June: 52, 53). Her salary was $52,000 per year, which is the only type of financial distribution she receives from Bagga Enterprises (June: 52, 87). She performed the same function for defendant United Management Services, Inc. ("United Management"), the Baggas' management company, for the preceding four to six years (June: 53, 54). During that time, she was paid approximately $36,000 a year by United Management (August: 115, 116)[3]. Her only source of personal income from 2000 through 2002 was the income from United Management (August: 116).

Bagga, with her husband, was in charge of cash. She was responsible for ensuring that the money from all the Bagga Enterprises' Arby's stores was transferred into one management company account, and for handling payments from that account to vendors and trades people (June: 80 - 83, 123). She told the bookkeeper which checks to write (June: 83-89). She "sometimes" consulted Paul Bagga concerning her decisions as to which checks should issue (June: 83, 84). If there was a problem in reconciling the bank statements for Bagga Enterprises, the bookkeeper consulted her (June: 85, 86).

When she wrote checks for Bagga Enterprises in December 2002, Bagga was not an employee of that company, but of United Management (June: 239). She was "in charge of the

---

[3] When Bagga resumed her deposition in August, she testified that at that time she was getting a paycheck only from Bagga-owned 21st Century Restaurant Solutions amounting to about $1500 every two weeks (August: 115).

check writing" (June: 239, 240). She performed the same functions for defendant Welcome Group, determining which checks to release and handling its wire transfers (June: 101, 104).

Bagga also wrote checks for American Merchandising, one of the family's clothing businesses, during the year 2000, among others. She did not dispute that during that period American Merchandising wrote at least a dozen checks to an entity identified as Ten Tigers, owned by the Chawlas, for millions of dollars (August: 116, 117; Hermann Affidavit ¶ 10, Exhibit 4). She speculated that the money was "probably" for buying merchandise but she was unsure; she had no documentation for the payment, and did not remember ever seeing any (August: 116, 117).

If the money for one of the Bagga entities was short, Bagga testified, she would put her own money into the account and would reimburse herself when there were sufficient funds (June: 128; August: 75-77). She would tell the bookkeeper to put it down on the company's profit and loss statement as a loan from her when her money went in and as a loan repayment when he wrote a check to her (June: 128, 129; August: 88, 89, 91 - 93). Other than her directive, the bookkeeper did not have to get approval from anyone for these transactions (August: 92).

Bagga testified she personally made a $40,000 loan to United Management on December 4, 2002 which had not been repaid (June: 235 - 238). However, she acknowledged that she signed a $13,500 check to herself as partial repayment of the loan (June: 241 - 244). She decided to repay herself, instead of repaying the Trust or Captec, and did not consult with Paul Bagga before she did so (June: 252, 253). She claimed the four defendant companies owed her " a lot" of money, but that she did not remember how much (June: 260; August: 90, 91). Other than the $40,000 loan, she might have made some loans to Bagga family-related businesses in the past five years, but she claimed not to remember the companies (August: 86, 87).

When the Bagga businesses needed money, Bagga contacted Hardeep Chawla about obtaining a loan from him (June: 183 - 84). After Paul Bagga arranged the loan, she was the person who talked to Chawla about getting the money and she was the person who went to Chawla's office and picked up checks "[a] couple of times" (June: 183 - 85).

Bagga transferred $362,000 on March 31, 2003 from Commerce Bank into her personal savings account at First Union Bank (August: 94 - 96). She did so, she claimed, because, as a result of this case, the Bank mistakenly attached her personal account at Commerce (August: 94 - 96). The money -- more than one-third of a million dollars -- had been in her Commerce Bank checking account for perhaps two years (August: 95, 96). She had deposited it as a lump sum but she did not remember where she got the money from, although a portion of the money may have been proceeds of an insurance claim (August: 95 - 98). She also transferred $23,000 to her personal checking account as a result of an MBNA credit card promotion which offered the money as an interest-free short-term loan (August: 98-99). Bagga's personal bank account summary reflecting activity in the second quarter of 2003 shows an aggregate of in excess of $400,000. Hermann Affidavit ¶ 10, Exhibit 5.

Bagga used the computer in the office building at 714 Bethlehem Pike to maintain records of her personal accounts (August: 8 - 10). She did not, however, use a computer in the office for any business purpose before May 2003 (August: 109-110). When she used e-mail in the office, she used it for personal as well as business reasons (August: 15). She wrote personal letters from the office, and she wrote letters from home as well as from the office (August: 12). She did not write many letters (August: 15). If she wrote a letter to someone while at home, she sometimes printed it out and sometimes saved it on the computer if she felt it was important (August: 19). Any copy of a letter that she saved would be either on or in her desk at home

(August: 20, 21). In sum, Bagga wrote both business and personal correspondence at both her office and her home.

After first invoking and then waiving her Fifth Amendment privilege against self incrimination, Bagga testified that she was the person who made the entries in the computer records in the Bagga office (August: 9, 10, 123). She was the person who prepared the applications for a refinancing of her multi-million dollar residence and a $244,000 loan for the office building she owns (August: 23, 125, 126).

On August 12, 2003, the Trust served Bagga with a subpoena *duces tecum* seeking records for the period from January 1, 2000 to the present pertaining to the tax returns for K & P, Bagga's personal tax returns and all correspondence written, prepared and/or sent by Bagga. Hermann Affidavit ¶ 11, Exhibit 6. The subpoena also seeks computer records for Bagga's home and/or personal computer from January 1, 2002 to the present. Bagga contests the portion of the subpoena *duces tecum* seeking her personal tax returns, her computer records and her correspondence for the relevant period.

Argument

## THE MOTION TO QUASH THE SUBPOENA SHOULD BE DENIED

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides in pertinent part that "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party. . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

The liberal relevancy standard applicable to discovery under Rule 26(b)(1) governs subpoenas as well. *Syposs v. United States*, 181 F.R.D. 224, 226 (W.D.N.Y. 1998). Federal

Rule of Civil Procedure 45(c)(3)(A)(iv) permits a court to quash or modify a subpoena if it "subjects a person to undue burden," but a movant seeking to quash a subpoena on this basis bears the "heavy burden of establishing that compliance with the subpoena would be 'unreasonable and oppressive.'" *Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enterprises, Inc.*, 160 F.RD. 70, 72 (E.D. Pa. 1995) (citation omitted); *Wright v. Montgomery County*, 1998 WL 848107 (E.D. Pa. 1998) (Tab 1).[4]

In *Wright v. Montgomery County*, 1998 WL 848107 *2, this Court summarized these principles governing a motion to quash a subpoena:

> Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure authorizes a court to quash or modify a subpoena that subjects a person to undue burden. . . . Accordingly, a court may quash or modify a subpoena if it finds that the movant has met the *heavy burden* of establishing that compliance with the subpoena would be "unreasonable and oppressive." . . Furthermore, Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." . . . Relevancy is to be *broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case.* . . . Rather, discovery requests may be deemed relevant if there is *any possibility that the information may be relevant to the general subject matter of the action.* . . . Although courts have imposed broader restrictions on the scope of discovery when a non-party is targeted . . . *discovery rules are to be accorded broad and liberal construction.* . . . Since the precise boundaries of the Rule 26 relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. . . .

(citations omitted) (emphasis added).

---

[4] Bagga cites a California case, *United States v. American Optical Company*, 39 F.R.D. 580 (N.D. Cal. 1966), for the proposition that the party opposing a motion to quash has the burden to demonstrate "good cause" for the production of the documents. That proposition is not the law of this District, as another case cited by Bagga demonstrates. *Davis v. General Accident Insurance Company of America*, 1999 WL 228944 *1 (E.D. Pa. 1999) (Tab 2) ("a court may quash or modify a subpoena if it finds that the movant has met the heavy burden of establishing that compliance with the subpoena would be 'unreasonable and oppressive.'")

To determine whether production poses an undue burden, the Court must consider the burden placed on the producing party, the necessity of the information for the party seeking production, and whether the information can be obtained from more convenient sources. *Allen v. Howmedica Leibinger*, 190 F.R.D. 518, 525 (W.D. Tenn. 1999).

Under these standards, Bagga cannot meet her "heavy burden" of establishing that the subpoena *duces tecum* is "unreasonable and oppressive." That conclusion is especially compelling here because Bagga's deposition testimony makes clear that she was a business person who employed her free access to the funds of the defendant companies, that she herself drew no distinction between her personal and her business dealings, and that she was incredibly evasive concerning her handling of the finances of the defendant companies.

As the deposition revealed, Bagga had little accountability and exercised great discretion in the disbursement of company funds, in some instances choosing to pay company expenses and in some choosing to "repay" herself for supposed loans that are not supported by any documentation. When Bagga desired that a check issue, she simply directed her assistant to issue it; nothing more than Bagga's instruction was needed.

Despite her position of fiscal responsibility, and despite her ownership of various companies throughout her career, she was unfailingly vague concerning the handling of millions of dollars in funds over which she had control. She was unable to provide a reason for $7 million that she disbursed to one Chawla-owned company during the year 2000 on behalf of American Merchandising -- a Bagga-owned company -- and she conceded that no documentation existed to support the disbursements. (This is important because her husband claimed that was the amount lost by American Merchandising in an improvident export transaction, and that is why the Trust was not repaid.) She claimed she might have made some "loans" to Bagga family-

related businesses in the last five years, but she could not remember the companies. She claimed the defendant companies owed her "a lot" of money was but could not remember how much.

Bagga was equally hazy concerning the source of funds that she contended were her hers, blurring the line between her personal and her business affairs. She has no credible explanation for the sources of large sums of money that are in her personal account. She acknowledged transferring $362,000 from Commerce Bank into her savings account only five months ago but claimed not to recall where the money came from, offering only the weak and partial explanation that perhaps less than a third of it came from an insurance settlement. Although she testified her income amounted to $52,000 a year, she was nonetheless in a position to make a $40,000 "loan" to United Management in December 2002. The Trust is not required to take Bagga's word for the source of these funds, especially where Bagga's explanations are evasive to the point of being unworthy of belief.

It is vital to have access to Bagga's personal computer as well as her personal tax returns and her correspondence. Bagga is an educated business woman with varied and substantial ownership interests in commercial and real property. She testified she did not use a computer in the companies' offices until May 2003. Taking her at her word, it is reasonable to look into the extent Bagga was utilizing her home computer to conduct business affairs. Indeed, if she were attempting to conceal financial dealings, for herself and her husband, it is entirely possible she *would* use her home computer, in the hope that she could shield records from discovery.

In addition, Bagga testified that she drafted correspondence from her home computer as well as from the office, that she saved any correspondence that she deemed "important" and that copies of any correspondence that she saved would be in or on top of her desk at home. Because Bagga was involved in the process of obtaining and making loans and transferring funds of the

defendant companies, it is eminently reasonable to explore whether the correspondence that Bagga saved in this fashion concerned the business and finances of the defendant companies.

Finally, Bagga's personal tax returns would corroborate or refute her deposition testimony that her income was a mere $52,000 per year. Since Bagga testified that she personally loaned $40,000 to United Management in one lump sum on December 4, 2002, her testimony concerning her income is, at the least, suspect. Given Bagga's access to the funds of the judgment debtors, the Trust should be entitled to put her to the proof of that statement.

As against these facts, Bagga's lawyers offer only the patently false spin that "[a]t best she is only a clerical employee of one of the four defendants" with "limited connection to these judgment debtors." Memorandum of Law in Support of Non-Party Bagga's Motion to Quash Subpoena ("Bagga Memorandum") at 4. Based upon this hypothesis -- which flies in the face of Bagga's own testimony and ignores the Court's prior ruling -- Bagga contends that the Trust's subpoena is "overwhelmingly broad and burdensome" and harassing, and violates her privacy. Bagga Memorandum at 4. None of these claims is supportable.

The subpoena is narrowly tailored to seek three tax returns and approximately 2 ½ years of computer records. These are hardly the types of requests that are so "unreasonable and oppressive" that compliance is unwarranted. Indeed, even with respect to the correspondence, Bagga testified that copies of any letters she has written would be either on top of her desk or in its drawers. Compliance with these requests would impose a minimal burden on Bagga.

Bagga's discussion "in general terms [of] the personal nature" of the information requested does not come close to meeting to meeting her "heavy burden" of demonstrating that the requests are oppressive. *Davis v. General Accident Insurance Company of America*, 1999 WL 228944 *1 (E.D. Pa. 1999) (Tab 2). In describing her records, Bagga's counsel use the

12

phrase "personal" in a conclusory, factual sense; the critical issue, however, is whether the records sought *are* truly personal, or involve transfers of business funds or other non-personal transactions. Given Bagga's testimony and the Court's prior ruling, the Trust is not required to take Bagga's dubious word.

Bagga has effectively forfeited any claim that the discovery of her personal finances is an unwarranted invasion of her privacy. Bagga has already provided to the Trust certain recent checking and savings account records of accounts in her name, presumably for the purpose of convincing the Trust that she had not engaged in any wrongful transfers. Hermann Affidavit ¶10, Exhibit 5. Having produced those records for the purpose of establishing her innocence, Bagga is hardpressed to now claim that it is a violation of her privacy to produce other records of a similar nature. *See Augustine v. Adams*, 169 F.R.D. 664, 670 (D. Kansas 1996) (production of videotape containing discussion of provisions of trust instrument waived whatever privilege might have protected trust instrument itself).

Bagga's counsel's brief distorts governing case law. Reliance upon *Hecht v. Pro-Football, Inc.*, 46 F.R.D. 605 (D.C. 1969), is misplaced. In *Hecht*, the defendant was a league of professional football clubs. The plaintiffs, individuals who were attempting to organize a professional football club in Washington, D.C., claimed that they were prevented from doing so because the authorities that operated the stadium in the D.C. area had made an exclusive agreement for the use of that stadium with the defendant. In an effort to prove the damages it had sustained by its inability to organize a football club, the plaintiff issued a third party subpoena to the Miami Dolphins football club, as a member of a professional football league, seeking its profit and loss statements and the prices paid for partnership interests in the club. The

court held that, although the Miami Dolphins were "allied" with the defendant, that fact alone was not enough to obtain its private financial records. Here, Bagga is demonstrably more than "allied" with the defendants. She was the primary actor in the movement of the defendant companies' funds, and her own deposition testimony establishes that she moved those funds to her own personal accounts.

*Hearst/ABC-Viacom Entertainment Services v. Goodway Marketing, Inc.*, 1993 WL 150350 (E.D. Pa. 1993) (Tab 3), also relied upon by Bagga's counsel, instead supports the Trust's effort to seek discovery. In *Hearst*, the Court denied a motion to quash a subpoena *duces tecum* designed to seek the source of the debtors' payments to their attorney for his legal fees. The Court held that a judgment creditor was entitled to the "examination of third parties in relation to the financial affairs of the judgment debtor" and concluded that disclosure of the source of the payments was precisely that type of inquiry. Here, similarly, the Trust seeks Bagga's financial records for the purpose of examining the relationship of her finances to that of the defendants.

*Strick Corporation v. Thai Teak Products Company, Ltd.*, 493 F. Supp. 1210 (E.D. Pa. 1980) and *Costamar Shipping Co., Ltd. v. Kim-Sail, Ltd.*, 1995 WL 736907 (S.D.N.Y. 1995) (Tab 4), which Bagga also relies upon, are simply inapposite. Bagga's counsel cite both, apparently for the proposition that the Trust is not entitled to the discovery sought until and unless it can make a factual showing as to an *alter ego* relationship between Bagga and the defendant companies. *Strick*, however, involved the Court's consideration of the constitutionality of the Pennsylvania state law garnishment procedures, holding that a third party's due process rights were violated when its property was garnished based solely on the allegation of an *alter ego* relationship. Bagga offers no support for that proposition that the

14

disclosure of three sets of tax returns and her computer records is subject to the heightened scrutiny afforded the garnishment of property.

Bagga's reliance upon *Costamar* is similarly unavailing. In that case, the subpoena *duces tecum* sought bank records and other financial records of a third party based solely on the allegation that the third party -- which was the defendant's agent -- had assets commingled with the defendant. The court held that although the commingling of the assets might lead to an inference that there had been a transfer of funds, that fact alone was not enough to establish a prima facie case of *alter ego*. In addition, the court found notable that the defendant was indebted to the third party, undermining the claim that the third party used the defendant for its own private ends.

Here, in contrast, Bagga's own testimony establishes transfers between the business accounts and her own, and she cannot satisfactorily account for more than $400,000 in her personal account, which is what the partial recent records show. If anything, *Costamar* supports denial of Bagga's motion to quash the subpoena in this case. Other unproduced records likewise may bear on additional transfers and diversions.

It is not persuasive for Bagga to argue that "no evidence of impropriety . . . has been uncovered" and that the Trust should be required to present evidence of an *alter ego* relationship between Mrs. Bagga and the judgment debtors" before obtaining the discovery sought. Unless Bagga is required to comply with the subpoena, the Trust will be unable to understand fully whether she has done it a wrong. *Grasselli Chemical Co. v. National Aniline & Chemical Co.*, 282 F. 379, 381 (S.D.N.Y. 1920). The Trust is not required to demonstrate an *alter ego* relationship before obtaining the requested discovery, although there is much evidence already of such a relationship. That is putting the cart well ahead of the horse.

15

## CONCLUSION

For the reasons stated herein, this Court should deny Bagga's motion to quash in its entirety.

Respectfully submitted,

Thacher Proffitt & Wood LLP

by: Robert Hermann (Attorney I.D. # RH 9994)
*Admitted Pro Hac Vice*
*Attorneys for Plaintiff FL Receivables Trust 2002-A*
50 Main Street
White Plains, NY  10606
(914) 421-4100

Obermayer Rebman Maxwell & Hippel LLP
*Attorneys for Plaintiff FL Receivables Trust 2002-A*
One Maxwell Center - 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA 19103

Dated:  September 5, 2003

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1999 WL 228944
**(Cite as: 1999 WL 228944 (E.D.Pa.))**
**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

William F. DAVIS,
v.
GENERAL ACCIDENT INSURANCE COMPANY OF AMERICA and William Jenkins.

**No. CIV. A. 98-4736.**

April 15, 1999.

*MEMORANDUM AND ORDER*

HUTTON .

**\*1** Presently before the Court are Defendants' Motion for Entry of a Protective Order (Docket No. 14), Plaintiff William Davis' reply (Docket No. 18), and Defendants' sur reply thereto (Docket No. 19). For the reasons stated below, the Defendants' motion is DENIED.

## I. *BACKGROUND*

Defendant General Accident Insurance Company of America ("General Accident") employed Plaintiff, William Davis, for fifteen years in its Information Services Department. Plaintiff consistently received high performance evaluations. The Plaintiff, an African-American, reported to John Cousins. Cousins reported to Defendant William Jenkins.

In May 1996, General Accident terminated Cousins for complaining to the EEO Department that: (1) Jenkins made racist remarks; (2) blocked attempts to promote Davis; and (3) falsely accused Davis of not being qualified for promotions. Following the termination of Cousins, General Accident instructed Davis to report to the EEO Department. Davis told the Department what he knew concerning Cousins' allegations. General Accident did not take any action against Jenkins.

Following this meeting with the EEO Department, General Accident denied Davis several promotions. Due to the threatening atmosphere and his belief that there was no future for him at General Accident, Plaintiff terminated his employment in September 1997. Subsequently, on December 29, 1997, Plaintiff filed a four- count complaint against General Accident and Jenkins. The four counts are: (1) a claim under 42 U.S.C. § 1981 --Count I; (2) a claim under 42 U.S.C. § 1985 -- Count II; (3) a claim under 42 U.S.C. § 1986 --Count III; and (4) a retaliation claim under Title VII-- Count IV.

During the time that General Accident employed Plaintiff, Derrick Coker worked as in-house counsel for the Law Offices of Ralph L. Herbst, II, one of the in- house legal offices that defended insureds of General Accident. Coker, who is also an African-American, alleges that Herbst harassed him based upon his race. Coker filed a grievance in May 1994 with General Accident's Human Resources Manager. Coker filed a complaint against General Accident in *Coker v. General Accident Insurance Co.,* No. CIV.A.97-6321 (E.D.Pa.). Coker later settled his dispute with General Accident.

Plaintiff has now subpoenaed Alan Epstein, Esquire. Epstein was Coker's attorney in his lawsuit against General Accident. The subpoena seeks "[a]ll non-privileged records, pleadings, documents, files, or other documents within [Epstein's] possession or control referring or relating to William F. Davis and the matter captioned at *Derrick Coker v. General Accident Insurance Company,* NO. 97-CV-7321 (E.D.Pa.1998)." On February 24, 1999, the Defendants filed this motion for a protective order.

## II. *STANDARD*

Under the Federal Rules of Civil Procedure and in the United States Court of Appeals for the Third Circuit, district courts have broad discretion to manage discovery. *See Sempier v. Johnson,* 45 F.3d 724, 734 (3d Cir.1995) . Rule 45(c)(3)(A) of the Federal Rules of Civil Procedure authorizes a court to quash or modify a subpoena that subjects a person to undue burden. *See* Fed.R.Civ.P. 45(c)(3)(A) (iv) ; *see also Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enter.,* 160 F.R.D. 70, 72 (E.D.Pa.1995) . Accordingly, a court may quash or modify a subpoena if it finds

that the movant has met the heavy burden of establishing that compliance with the subpoena would be "unreasonable and oppressive." *Id.*

**\*2** Furthermore, Rule 26(b)(1) provides that discovery need not be confined to matters of admissible evidence but may encompass that which "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1) . Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978) . Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. *See id.* As this Court has noted, "[r]elevance is broadly construed and determined in relation to the facts and circumstances of each case." *Hall v. Harleysville Ins. Co.,* 164 F.R.D. 406, 407 (E.D.Pa.1996) . Once the party opposing discovery raises its objection, the party seeking discovery must demonstrate the relevancy of the requested information. *See Momah v. Albert Einstein Med. Ctr.,* 164 F.R.D. 412, 417 (E.D.Pa.1996) . The burden then shifts back to the objecting party, once this showing is made, to show why the discovery should not be permitted. *See id.*

Courts have imposed broader restrictions on the scope of discovery when a non- party is targeted. *See Thompson v. Glenmede Trust Co.,* No. CIV. A.92-5233, 1995 WL 752422, at \*2 n. 4 (E.D.Pa. Dec.19 1995) (Hutton, J.). Nevertheless, discovery rules are to be accorded broad and liberal construction. *See American Health Sys. v. Liberty Health Sys.,* No. CIV.A.90-3112, 1991 WL 30726, \*2 (E.D.Pa. Mar.5, 1991) . Because the precise boundaries of the Rule 26 relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. *See Thompson,* 1995 WL 752422, at \*2 n. 4.

### III. *DISCUSSION*

A. *Standing*

Before the Court addresses the merits of Defendants' motion, the Court must first consider Plaintiff's argument that the Defendants do not even have standing to object to a subpoena of Mr. Epstein, a non-party. Ordinarily, only the non-parties whom were served with the subpoenas may move to have them quashed under Federal Rule of Civil Procedure 45(c)(3)(A) . *See Smith v. Midland Brake, Inc.,* 162 F.R.D. 683, 685 (D.Kan.1995) ; *United States v. Urban Health Network, Inc.,* No. CIV.A.91-5976, 1992 WL 164950, at \*1 n. 1 (E.D.Pa. July 6, 1992) ; *Sneirson v. Chemical Bank,* 108 F.R.D. 159, 161 (D.Del.1985) . An exception exists, however, where a party claims "some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty." *Dart Indus., Inc. v. Liquid Nitrogen Proc. Corp. of Cal.,* 50 F.R.D. 286, 291 (D.Del.1970) .

**\*3** While the Defendants do not specifically address whether they allege any personal right or privilege in the subject matter of the subpoenas, this Court finds that they have standing to challenge the subpoena of Mr. Epstein. In their argument requesting a protective order, Defendants claim that the subpoenas involve the production of documents protected by the attorney-client privilege. *See Florida v. Jones Chems., Inc.,* No. CIV.A.90-875, 1993 WL 388645, at \*2 (1993) (finding that movants had standing to assert their claims of attorney-client and work product privilege with respect to the testimony and documents sought in the subpoena directed to a non-party). Moreover, Defendants allege some personal right in the documents produced during the *Coker* matter. *See Dart Indus.,* 50 F.R.D. at 291-92 (finding that movant had standing to challenge subpoena because, while movant did not assert any personal privilege with respect to the documents requested in the subpoena, it did aver that some of these documents were "secret and confidential" and produced under

protective orders limiting their disclosure). Accordingly, the Court is satisfied that the Defendants have standing to challenge the subpoena at issue.

## B. *Relevance and Overbreadth*

The Defendants ask this Court to quash the subpoena because the subpoena is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. More specifically, the Defendants contend that the *Coker* information is not relevant because: (1) Coker had no contact with Jenkins, the alleged harasser in this case, and (2) Coker was not located in the offices of the Plaintiff, where the alleged harassment took place in this case. The Plaintiff responds that this information is relevant because it is evidence of a racially hostile work environment at General Accident.

This Court finds that the subpoena is not overbroad and is reasonably calculated to lead to the discovery of admissible evidence. First, the Court finds that the Defendants failed to demonstrate how the subpoena is overbroad. The Defendants only discuss in general terms the personal nature of the personnel files of their employees. This is insufficient to show overbreadth.

Second, the Court concludes that the *Coker* documents may reasonably be calculated to lead to admissible evidence in this case. While Coker may not have been similarly situated to Plaintiff, his treatment by General Accident may be relevant to whether a racially hostile work environment exists at the various offices in General Accident. *See, e.g., Ingram v. Home Depot, U.S.A., Inc.,* No. CIV.A.97-8060, 1999 WL 88939, at *3 (E.D.Pa. Feb.19, 1999) (rejecting defendants' relevancy objections to producing any personnel documents on employee who may have been involved in creating an alleged hostile working environment that defendants failed to remedy). For instance, this evidence may demonstrate that General Accident permits a racially hostile work environment which forced Coker and the Plaintiff--both of whom are African- American--and Cousins--who is not African-American but reported Jenkins' alleged harassing treatment of African-Americans--out of their jobs. Thus, the Court rejects the Defendants' request to quash the subpoena.

## C. *Confidentiality*

*4 Next, Defendants ask this Court to issue a protective order due to the confidential nature of the *Coker* documents. Defendants contend that many of the documents concern Coker's representation of clients and, thus, are protected under the attorney-client privilege. This Court disagrees. The subpoena requests "[a]ll *non-privileged* records, pleadings, documents, files or other documents." Thus, by definition, the subpoena does not raise any privilege concerns. Accordingly, the Court denies the Defendants' motion in this respect.

## D. *Attorney's Fees and Self-Executing Disclosures*

Finally, Plaintiff asks for attorney's fees in defending this motion. The Court refuses to exercise its discretion and award attorney's fees under the circumstances of this case. Furthermore, Defendants asks this Court to deny the discovery sought because Plaintiff failed to serve his self-executing disclosures. The Court will not quash or modify a valid subpoena based upon the unsupported allegation that Plaintiff has yet to serve his self-executing disclosures. Accordingly, the Court denies both of these requests.

An appropriate Order follows.

*ORDER*

AND NOW, this 15th day of April, 1999, upon consideration of the Defendants' Motion for Entry of a Protective Order, IT IS HEREBY ORDERED that the Defendants' motion is DENIED.

1999 WL 228944, 1999 WL 228944 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
**(Cite as: 1993 WL 150350 (E.D.Pa.))**
H
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

HEARST/ABC-VIACOM ENTERTAINMENT SERVICES, Plaintiffs,
v.
GOODWAY MARKETING, INC., Cpn Inc., Donald L. Wolk and Beryl J. Wolk, Defendant.

**Civ. A. No. 87-1638.**

April 30, 1993.

Melvin A. Schwarz, Lynn A. Herbert, Dechert Price & Rhoads, Philadelphia, PA, for plaintiff.

Mark A. Lopeman, Tofel, Berelson & Saxl, Robert L. Tofel , New York City, pro hac vice, for plaintiff.

Gilbert B. Abramson , Abramson, Cogan, Kogan, Freedman & Thall, P.C., Bruce L. Thall , Philadelphia, PA, Thomas Peppert, Patterson Belknap Webb & Tyler, New York City, for Donald L. Wolk, Berly J. Wolk, Goodway Marketing, Inc. & CPN, Inc.

Jeremy D. Mishkin , H. Eisenberg, Montgomery McCracken Walker & Rhoads, Melvin A. Schwarz, Lynn A. Herbert, Dechert, Price & Rhoads, Philadelphia, PA, for K. Lyons & T. Burchill.

MEMORANDUM

JAMES MCGIRR, District Judge.

*1 Paul Breen, Esq., ("Movant") attorney for Defendant, moves the court pursuant to Rule 45(c) of the Fed.R.Civ.P . to Quash Subpoena and/or pursuant to Rule 26(c) of the Fed.R.Civ.P . For a Protective Order.

The Plaintiff ("HAVES") on or about December 17, 1991, obtained judgment against the Defendants (the "Wolks") in the amount of $380,636.75. As of the date of this order, judgment remains unsatisfied. Subsequent to entry of judgment, the Wolks retained Paul Breen as counsel.

On or about January 25, 1993, Paul Breen was served with a Subpoena Duces Tecum. The Subpoena requested information pertaining to fee arrangements with his client, the Wolks. Movant is willing to provide the information on the amount of payment received by Movant and his law firm. However, Movant insists that such other information pertaining to the source of such payments, identity of funds used to make the payments is privileged information. Movant asserts that such information can be obtained directly from the client.

Plaintiffs contend that the Subpoena seeks information not protected under the attorney-client privilege.

The attorney-client privilege protects confidential disclosures relating to legal matters made by a client to his/her attorney. In re Grand Jury Investigation (Tinari), 631 F.2d 17, 19 (3d Cir.1980) , cert. denied, Tinari v. U.S., 449 U.S. 1083 (1981) ; Fisher v. United States, 425 U.S. 391, 403 (1976) . The privilege does not extend to all attorney-client communications. Communications pertaining to future illegal activity are not protected under the privilege. In re Grand Jury Investigation (Tinari), supra; Clark v. United States, 289 U.S. 1, 15 (1933) . Under most circumstances, identity of clients and fee arrangements are not protected under the privilege. Id.; (citing In re Semel, 411 F.2d 195, 197 (3d Cir.) , cert. denied, 396 U.S. 905 (1969) ). However, if disclosure of such information would serve to implicate the client in activities for which legal advice was sought, such information might be protected under the privilege. Id.; (citing United States v. Hodge and Zweig, 548 F.2d 1347, 1353 (9th Cir.1977) ). The present situation does not precipitate such protection.

The existence of an attorney-client relationship between the Wolks and Breen has been freely disclosed. Movant objects to disclosure of the source or sources utilized in payment of legal fees. There has been no suggestion that disclosure of such information would in any way further implicate the Wolks in the matter for which they have consulted Breen. In addition, it has never been implied

that individuals who may have made payments on the Wolks' behalf were clients of the Movant. Therefore, disclosure of the source of payments would not violate the attorney-client privilege.

Furthermore, when attempting to satisfy a judgment, a judgment creditor is entitled to a thorough examination of the judgment debtor's assets. *Caisson Corporation v. County West Building Corp.,* 62 F.R.D. 331, 334 (E.D.Pa.1974) (citing *Monticello Tobacco Co., Inc. v. American Tobacco Co.,* 12 F.R.D. 344 (S.D.N.Y.1952)*, aff'd on merits,* 97 F.2d 629 (2nd. Cir.1952) *cert. denied,* 344 U.S. 875 (1958) ; *7 Moore's Federal Practice* § 69.05(1) (1974); 12 Wright and Miller, *Federal Practice and Procedure* § 3014 (1973) ). This may include the examination of third parties in relation to the financial affairs of the judgment debtor. *Id.* Evidence of a relationship between the third-party and judgment debtor must be set forth. *Id.* In addition, the questions should be narrowly drawn to examine assets of the judgment debtor. See *id.* (citing *Burak v. Scott,* 29 F.Supp. 775 (D.D.C.1939) ; 12 Wright and Miller, *Federal Practice and Procedure,* supra. This allows the court to balance the interests of both parties and provide protection from baseless harassment.

**\*2** In so forth that third parties may be examined in relation to the financial affairs of judgment debtors, this court shall permit the listed questions to be answered. There is sufficient information to establish a relationship between the judgment debtors and Movant. The questions are narrowly focused around the Wolk's financial circumstances. Therefore, the court is satisfied that the subpoena is not for the purpose of harassment. Movant's motion shall be denied.

An appropriate order follows.

## ORDER

AND NOW, this 29 day of April, 1993, in consideration of Paul Breen, Esq., attorney for Defendant Wolks Motion to Quash the Subpoena and/or for a Protective Order, Plaintiff Judgment Creditor's Answer, and the foregoing Memorandum of Law, it is hereby ORDERED that:
1) Movant's Motion is DENIED.
2) Movant is ORDERED to Respond to Plaintiff Judgment
Creditor's Subpoena within thirty (30) days of the date of this Order.

1993 WL 150350 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
**(Cite as: 1995 WL 736907 (S.D.N.Y.))**
C
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

COSTAMAR SHIPPING CO., LTD., Petitioner,
v.
KIM-SAIL, LTD., Respondent.

**No. 95 CIV. 3349 (KTD).**

Dec. 12, 1995.

Edward P. Flood, Chalos & Brown, P.C., New York City.

Terry L. Stoltz , New York City.

## MEMORANDUM AND ORDER

FRANCIS, United States Magistrate Judge.

*1 The plaintiff in this action, Costamar Shipping Co., Ltd. ("Costamar") seeks to compel non-party Kersten Shipping Agency, Inc. ("Kersten") to produce for inspection certain documents identified in a subpoena. In addition, Costamar seeks attorneys' fees and costs incurred in connection with bringing this motion. For the reasons that follow, Costamar's motion is denied.

*Background*

On June 27, 1995, this Court confirmed an arbitration award of $358,028.13 payable to Costamar by Kim-Sail, Ltd. ("Kim-Sail"). This arbitration arose from a dispute between Costamar, [FN1] owner of the shipping vessel M/V Adventure in 1991 and 1992, and Kim-Sail, [FN2] which chartered the M/V Adventure. To date, Kim-Sail has not paid any portion of the judgment.

To aid in satisfying the judgment, Costamar served Kim-Sail with a subpoena pursuant to Rule 69(a) of the Federal Rules of Civil Procedure . It personally served Philip Gardner, Kim-Sail's Corporate Secretary, on July 6, 1995. The subpoena demanded that Kim-Sail produce records that would assist Costamar in identifying assets belonging to Kim-Sail.

On that same day, Costamar personally served Mr. Gardner with a subpoena addressed to Kersten Shipping (the "First Kersten Subpoena"). Mr. Gardner has been the President of Kersten Shipping since August 1994 and was Chartering Manager of Kersten in 1991. Deposition of Philip C. Gardner, dated July 19, 1995 ("Gardner Dep.") at 41. Kersten Shipping is a New York corporation that serves as Kim-Sail's general agent in the United States, and it acted in this capacity in 1991 when it chartered the M/V Adventure from Costamar. Kersten has acted as agent for a number of other companies engaged in commercial shipping in addition to Kim-Sail. Gardner Aff. at ¶ 2.

The First Kersten Subpoena required the production of: (1) all Kersten financial and property records related to Kim-Sail, (2) Kersten's most recent bank ledger sheets with respect to accounts owned by Kim-Sail, and (3) real property deeds owned by Kim-Sail in Kersten's possession. It also sought to depose Mr. Gardner. The required statutory fees were tendered at the time of service. Fed.R.Civ.P. 45 (b)(1) .

In response to the subpoena, Mr. Gardner produced copies of four time charters involving other vessels Kim-Sail had chartered between 1993 and 1995, as well as check stubs from Kim-Sail's New York checking account which had been closed in 1993. Flood Aff. at ¶ 22. During his deposition, Mr. Gardner noted that he had not attended any of Kim-Sail's Board of Directors meetings and did not know the names of its president, vice-president, and treasurer. Gardner Dep. at 8-10, 16, 89. In addition, although he was Kim-Sail's Corporate Secretary, he did not know any of Kim-Sail's personnel in Grand Cayman where it is incorporated, but only corresponded with a post office box address there. Gardner Dep. at 11-12, 15. Responding to the plaintiff's query concerning Kim-Sail's assets, Mr. Gardner testified that Kim-Sail was an inactive company and had no assets to satisfy the judgment. Gardner Aff. at ¶ 11.

*2 Subsequent to the deposition, Kersten produced bank statements from Kim- Sail's money market

account from July 1993 through June 1995, an insurance cover note, and the agency agreement between Kersten Shipping and Kim-Sail which had been executed in July 1979. Flood Aff. at ¶ 24. Mr. Gardner asserted that because of limited time, he had not been able to gather these documents by the deposition date. Gardner Aff. at ¶ 5. In addition, Kersten advised Costamar that it possessed a June 30, 1993 Accounts Receivable Report that covered activities as far back as 1991 and was still trying to determine if it could obtain any voyage files prior to August 1993. Gardner Aff. at ¶ 8.

On the basis of Mr. Gardner's testimony that revenue derived from Kim-Sail had been placed directly in Kersten's general bank account, [FN3] Costamar alleged that Kersten had commingled its assets with Kim-Sail's. Flood Aff. at ¶ 27. Recognizing that some of Kim-Sail's income had been deposited in Kersten's bank account and that Kersten had not produced its bank records in response to its initial subpoena, Costamar personally served Ben Bradburn of Kersten with a second subpoena (the "Second Kersten Subpoena"). No witness fee was tendered at this time.

The subject of this motion, the Second Kersten Subpoena, requested the production of: (1) all financial and business records maintained by Kersten pertaining to Kim-Sail's activities, (2) a copy of all charter parties in which Kersten acted as the general agent between 1991 and the present, (3) Kersten's bank records for the years 1991-1995, (4) all documents relating to corporate securities owned by Kersten, (5) all financial records of businesses in which Kersten has a ownership interest, (6) the names and addresses of enterprises currently indebted to Kersten, (7) copies of Kersten's income tax returns for the last five years, and (8) all titles to property owned by Kersten. Kersten objected to this subpoena. It stated that Costamar had all pertinent Kim-Sail documents, apart from the charter documents which Costamar had agreed to view in Kersten's office. With regard to the other documents, Kersten objected to their production because they referred to operations of Kersten and not of Kim- Sail.

*Discussion*

A. *Service of the Second Kersten Subpoena*

Kersten asserts that the Second Kersten Subpoena was improperly served because of Costamar's failure to tender statutory fees at the time of service. Where no fee is tendered with the service of a subpoena requiring a witness' attendance, the service is invalid. *CF & I Steel Corp. v. Mitsui & Co. (USA)*, 713 F.2d 494, 496 (9th Cir.1983) . Rule 45(b)(1) of the Federal Rules of Civil Procedure states that "service of a subpoena ... shall be made by delivering a copy [of the subpoena] ... and, *if the the person's attendance is commanded*, by tendering to that person the fees for one day's attendance and the mileage allowed by law." Fed.R.Civ.P. 45(b)(1) (emphasis added). Since the Second Kersten Subpoena only required the production of documents and not the attendance of a witness, service was valid.

B. *Entitlement to Discovery*

**\*3** Rule 69 of the Federal Rules of Civil Procedure provides that "[i]n aid of the judgment or execution, the judgment creditor ... may obtain discovery from any person, including the judgment debtor, in the manner provided in these rules or in the manner provided by the practice of the state in which the district court is held." Fed.R.Civ.P. 69(a) . Under this rule, discovery may be "permitted against a non-party where the relationship between the judgment debtor and the non-party is sufficient to raise a reasonable doubt about the bona fides of the transfer of assets between them". *Magnaleasing, Inc. v. Staten Island Mall*, 76 F.R.D. 559, 562 (S.D.N.Y.1977) (citing *Caisson Corp.*

*v. County West Building Corp.*, 62 F.R.D. 331, 335 (E.D.Pa.1974) ). Pursuant to Rule 69(a) , "the judgment creditor must be given the freedom to make a broad inquiry to discover hidden or concealed assets of the judgment debtor." *Caisson*, 62 F.R.D. at 334 (citations omitted); 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3014 at 72 (1973) .

Generally, non-parties may only be examined about the assets of a judgment debtor and cannot be required to disclose their own assets. *Magnaleasing*, 76 F.R.D. at 561-62 ; *Caisson*, 62 F.R.D. at 334 ; *Burak v. Scott*, 29 F.Supp. 775, 776 (D.D.C.1939) (quashing Rule 69 subpoena requiring non-parties to disclose their individual assets); 12 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3014 at 72 (1973) . Thus, under Rule 69(a) and existing case law, the general rule is that non-party discovery is limited to a search for the defendant's hidden assets. *Magnaleasing*, 76 F.R.D. at 561-62 (citing *Burak*, 29 F.Supp. at 776). Applying this rule here, discovery must therefore be restricted to the alleged transfer of Kim-Sail's assets to Kersten. With regard to the Second Kersten Subpoena, only Kersten records relating to activities conducted on behalf of Kim-Sail are discoverable. However, this category of documents has purportedly been produced pursuant to the First Kersten Subpoena.

In the alternative, Costamar alleges that an alter ego relationship exists between Kim-Sail, the judgment debtor, and Kersten. If such a relationship were established, Costamar could pierce the corporate veil and obtain discovery of Kersten's assets. In *Trustees of North Florida Operating Engineers Health & Welfare Fund v. Lane Crane Service, Inc.*, 148 F.R.D. 662, 664 (M.D.Fla.1993) , the court held that evidence that a non-party was an alter ego of the judgment debtor was adequate to warrant discovery from the non-party in aid of execution. However, the mere allegation of an alter ego relationship is insufficient; it must be supported by facts showing the basis for the assertion. *Strick Corp. v. Thai Teak Products Co.*, 493 F.Supp. 1210, 1218 (E.D.Pa.1980) .

In New York, courts "disregard the corporate form reluctantly." *Itel Containers Int'l. Corp. v. Atlanttrafik Express Service Ltd.*, 909 F.2d 698, 703 (2d Cir.1990) . The corporate veil will be pierced only when the corporate "form has been used to achieve fraud, or when the corporation has been so dominated by an individual or another corporation ... and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own and can be called the other's alter ego.' " *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.1979) (citation omitted). The factors that courts consider in determining whether to pierce the corporate veil include the intermingling of corporate and personal funds, undercapitalization of the corporation, failure to observe corporate formalities including the maintenance of separate books and records, failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder, and the inactivity of other officers and directors. *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600-01 (2d Cir.1989) (collecting cases). Although there is no set rule as to how many of these factors must be present to pierce the corporate veil, the "general principle followed by the courts has been that liability is imposed when doing so would achieve an equitable result." *Id.* at 601 (citation omitted).

*4 An inference can be drawn from Kersten's commingling of its funds with those of Kim-Sail that there may have been a transfer of assets between the two corporations. The general rule is that an agent must segregate its principal's funds from its own:
[u]nless otherwise agreed, an agent receiving or holding things on behalf of the principal is subject to a duty to the principal not to receive or deal with them so that they will appear to be his own, and not so to mingle them with his own things as to destroy their identity.
*Restatement (Second) of Agency* § 398 (1957) . However, the mere fact that there is co-mingling of assets is not enough to establish a prima facie case of alter ego. *See William Wrigley*, 890 F.2d at 600-

01 (alter ego analysis requires consideration of totality of circumstances). In addition, there has been no evidence that Kersten used Kim-Sail for its own private ends, another element important to demonstrating an alter ego relationship. On the contrary, Kim-Sail was indebted to Kersten for $420,000. Gardner Aff. at ¶ 11. Furthermore, there has been no evidence of fraud or unjust enrichment. Thus, Costamar has not demonstrated that the corporate veil should be pierced.

Nevertheless, further discovery of Kersten's relationship with Kim-Sail may be appropriate. If, through such discovery, Costamar can provide evidence of fraud or unjust enrichment, additional discovery into Kersten's assets may be warranted on the basis of an alter ego theory.

C. *Attorney's Fees*

Pursuant to rule 37(a)(4) of the Federal Rules of Civil Procedure , Costamar seeks reasonable expenses incurred in bringing this motion, including attorneys' fees. Because its motion is denied, Costamar's request for attorneys' fees is also denied.

*Conclusion*

For the reasons set forth above, Costamar's motion to compel Kersten to produce documents in response to the Second Kersten Subpoena is denied.

SO ORDERED.

FN1. Costamar is a foreign corporation with an office and principal place of business in Piraeus, Greece. Affidavit of Edward P. Flood dated August 23, 1995 ("Flood Aff.") at ¶ 3.

FN2. Kim-Sail is a foreign corporation incorporated in the Cayman Islands. Affidavit of Philip Gardner, dated August 28, 1995 ("Gardner Aff.") at ¶ 1.

FN3. The following exchange occurred between Mr. Gardner and Costamar's lawyers:
Q: Pursuant to the charter parties that Kim-Sail had worked out with its shippers and/or subcharterers, they were required to pay freight by paying into Kim-Sail account; is that correct?
A: No, they would be instructed to pay into Kersten's account at least since I have been president. We have taken the freight money, any freight money into Kersten's account and paid expenses out of that account. What was done before that, I really don't know.
Q: So the money is put into Kersten's account?
A: Since I have been president, that is the way I have handled it.
Gardner Dep. at 39-40.

1995 WL 736907 (S.D.N.Y.)

END OF DOCUMENT